UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARY R. PITT,<br><br>　　　　　*Plaintiff*,<br><br>　　v.<br><br>ALEJANDRO N. MAYORKAS,[1]<br><br>　　　　　*Defendant*. | Civil Action No. 17-2466 (TJK) |

**MEMORANDUM OPINION**

Plaintiff Mary Pitt challenges the Department of Homeland Security's decisions not to promote her to two different positions and to fill a third position in a way that made her ineligible to apply. She sued to allege discrimination on the basis of her race and sex in violation of Title VII of the Civil Rights Act. Defendant has moved for summary judgment. ECF No. 17. For the reasons explained below, the Court will grant the motion.

**I.   Background**

Pitt is an African-American woman who worked for the Department of Homeland Security (DHS) as a Management Program Analyst. ECF No. 17-20 ¶¶ 1–3. In 2015, she applied for two openings for a Protective Security Advisor (PSA) position: one in Arkansas and the other in Washington, D.C. *Id.* ¶¶ 6, 9. A PSA works with federal agencies, local agencies, and private companies on security and enforcement measures to protect critical infrastructure. ECF No. 18-8 at 2; ECF No. 18-12 at 2. Pitt interviewed for both positions in June 2015, but she was ultimately not selected for either. ECF No. 17-20 ¶¶ 12–15. Two white men were hired

---

[1] Under Federal Rule of Civil Procedure 25(d), Alejandro N. Mayorkas is automatically substituted as Defendant for Elaine C. Duke.

instead.  *Id.* ¶ 15.  Later that summer, Defendant sought to fill two vacant PSA positions in Atlanta, Georgia, as internal, lateral reassignment opportunities, rather than through competitive selection processes, and as such, the positions were available only to GS-14 and GS-15 level employees.  *Id.* ¶ 21; ECF No. 17-16 at 5.  Pitt, at the GS-13 level, was thus ineligible.  ECF No. 17-20 ¶ 22.  An African-American man and Indian-American man were ultimately selected.  ECF No. 17-18 at 6.

Pitt then filed an Equal Employment Opportunity (EEO) complaint alleging Defendant discriminated against her on account of her race and sex when she was not selected for the PSA positions in Arkansas and Washington, D.C.  ECF No. 1 ¶ 14.  She later amended that complaint to allege that the discrimination also extended to Defendant's decision to exclude her from applying for the PSA position in Atlanta.  *Id.*  After receiving a right-to-sue letter, she filed this suit alleging race and sex discrimination in violation of Title VII of the Civil Rights Act.  *Id.* ¶¶ 1–2.

## II.     Legal Standard

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriately granted when, viewing the evidence in the light most favorable to the non-movants and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in their favor."  *Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016).  To survive summary judgment, a plaintiff must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate

specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation omitted). Courts "are not to make credibility determinations or weigh the evidence." *Lopez*, 826 F.3d at 496 (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). But the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

"The movant bears the initial burden of demonstrating that there is no genuine issue of material fact." *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017). "In response, the non-movant must identify specific facts in the record to demonstrate the existence of a genuine issue." *Id.* And for claims where the non-movant bears the burden of proof at trial, as here, she must make an evidentiary showing "sufficient to establish the existence of [each] essential element to [her] case." *Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" and therefore entitles the moving party to "judgment as a matter of law." *Id.* at 323. "Importantly, while summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of his obligation to support his allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Pollard v. Quest Diagnostics*, 610 F. Supp. 2d 1, 17 (D.D.C. 2009) (cleaned up).

**III.     Analysis**

"Title VII requires that '[a]ll personnel actions affecting employees or applicants for employment . . . in executive agencies . . . be made free from any discrimination based on race.'" *Barnette v. Chertoff*, 453 F.3d 513, 515 (D.C. Cir. 2006) (quoting 42 U.S.C. § 2000e-16(a)). When, as here, a plaintiff offers no direct evidence of discrimination, the claim is analyzed under the *McDonnell Douglas* burden-shifting framework. *Id.* Under that framework, Plaintiff bears the initial burden to establish a prima facie case of discrimination by showing that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *White v. Vilsack*, 888 F. Supp. 2d 93, 98 (D.D.C. 2012) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)). "Once she has done that, the burden shifts to the defendant, who must 'articulate some legitimate, nondiscriminatory reason' for the adverse action." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Then, "once the employer asserts a legitimate, non-discriminatory reason, the question whether the employee actually made out a prima facie case is no longer relevant and thus . . . 'drops out of the picture.'" *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). In other words, "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race . . . ?" *Id.* at 494.

A.     **PSA Positions in Arkansas and Washington, D.C.**

Defendant asserts that Pitt was not selected for these positions because others were more qualified, and a "qualifications-based justification constitutes a legitimate, nondiscriminatory reason" for a personnel action that shifts the burden back to the plaintiff. *See Holcomb v. Powell*, 433 F.3d 889, 896 (D.C. Cir. 2006). Defendant asserts that the interview panelists did not recommend Pitt for either job because she did not demonstrate a good understanding of the PSA role or critical infrastructure, did not display strong communication skills, and scored significantly lower on her interviews than the selectees. ECF No. 17-3 at 6–7, 9. Defendant also conducted the interviews for these positions in accordance with standard procedures and a numerical rating system. *See, e.g.*, *Bell v. Donley*, 928 F. Supp. 2d 174, 179–80 (D.D.C. 2013) (plaintiff's argument that she was "significantly better qualified" than selectee had "little support" where three-member interview panel independently ranked plaintiff among lowest candidates after asking each applicant the same six questions and rating responses on scale from one to ten). At the interview stage, the panelists used a standard set of questions for each applicant to assess their knowledge and experience about critical infrastructure protection, familiarity with local critical infrastructure, interpersonal and oral communication skills, and technical acumen. ECF No. 17-4 at 4; *see also id.* at 7. The panel members scored each applicant's responses with a score on a scale from one to five, and after all interviews were complete, the panel reviewed scores and discussed the candidates, then submitted a recommendation to the hiring authority. *Id.* at 4.

For the Arkansas position, Pitt was interviewed first by Steven Nicholas, Kelly Wilson, and Jamie Richards, and then again by Richards, Nicholas, and Elizabeth Clifton. ECF No. 17-8

5

at 5. Pitt received the lowest score out of the five interviewees, 20.33 out of 45, ECF No. 17-5 at 8; ECF No. 17-6 at 1, while the selectee scored a nearly perfect 43.35 out of 45, more than 20 points higher, ECF No. 17-7 at 1. According to Clifton, Pitt "was not able to articulate the impacts of the loss of critical infrastructure and had no understanding of infrastructure in Arkansas." Instead, she "only provided broad sweeping generalizations" related to critical infrastructure during the interview, and her "communication skills—a key element of being a PSA—did not reflect someone who is comfortable briefing in public." ECF No. 17-4 at 6, 9. The other two panelists echoed her comments. ECF No. 17-5 at 6; ECF No. 17-8 at 7.

For the Washington, D.C., opening, Pitt was interviewed by John Guest, Matthew Wombacher, and Clifton. ECF No. 17-4 at 5. For this opening, she received the second-lowest score out of twelve interviewees, 24.66 out of 45, while the selectees received the highest scores, 38.68 and 38.66. ECF No. 17-9; ECF No. 17-10 at 1; ECF No. 17-11 at 1; ECF No. 7-12 at 1. The panelists viewed her candidacy for this post similarly. Wombacher stated Pitt "did not sufficiently demonstrate . . . knowledge of the national capitol regions Critical Infrastructure, nor was there demonstrated understanding as to the role of the Protective Security Advisors" in the protection of critical infrastructure, ECF No. 17-13 at 6, and the other panelists expressed similar opinions, ECF No. 17-4 at 6, 9; ECF No. 17-14 at 7–8. And the panelists thought Plaintiff was "very nervous" and "struggled to clearly articulate her points." ECF No. 17-13 at 7; ECF No. 17-4 at 9.

Pitt contends that Defendant's asserted, nondiscriminatory reason for not hiring her is pretextual. She argues that (1) Defendant failed to follow the proper hiring procedures in several ways; (2) the panelists gave implausible and conflicting accounts as to why she was not selected;

(3) she performed well during the interview; and (4) no African-American woman has ever been selected as a PSA. The Court addresses each of these arguments in turn, finding that none show pretext.

First, Pitt argues that the panel "violated well-established merit systems protection law in passing [her] over in favor of white male selectees who are not veterans" because she qualified for veterans' preference. ECF No. 18 at 16–17. But Pitt mischaracterizes veterans' preference law. As Defendant explains, although eligible veterans receive a preference in hiring when entering the competitive service, 5 U.S.C. § 2108a(c), that preference "does not apply . . . to inservice placement actions such as promotions," *see* 5 C.F.R. § 211.102. In other words, it "only applies to initial employment, not to movement of an incumbent employee from one job to another within an agency"—*i.e.*, the type of personnel action here. *Chavers v. Shinseki*, 667 F. Supp. 2d 116, 131 n. 11 (D.D.C. 2009); *see also Brown v. Dep't of Veterans Affairs*, 247 F.3d 1222, 1224 (Fed. Cir. 2001). Thus, even though the selectees were not veterans, that fact does not show that Defendant's procedures were improper, let alone that the panel acted with any discriminatory motive.

Pitt also argues that the procedures were improper because the panel considered the applicants' knowledge of local critical infrastructure, even though this specific criterion was not listed in the vacancy announcements. ECF No. 18 at 7, 18. But "the fact that an employer 'based its ultimate hiring decision on one or more specific factors encompassed within a broader and more general job description does not itself raise an inference of discrimination sufficient to overcome summary judgment.'" *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1228 (D.C. Cir. 2008) (quoting *Jackson v. Gonzales*, 496 F.3d 703, 709 (D.C. Cir. 2007)); *see also Gold v.*

*Gensler*, 840 F. Supp. 2d 58, 68 (D.D.C. 2012) ("[R]easonable employers 'do not ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by the written job descriptions.'" (quoting *Jackson,* 496 F.3d at 709)). Here, knowledge of local critical infrastructure was "fairly encompassed within the announcement." *Adeyemi*, 525 F.3d at 1228. Clifton explained that knowledge of local infrastructure is implicitly relevant to an applicant's "ability to engage" in the role as "the federal point of contact for local infrastructure owners and operators requiring assistance and protection planning," ECF No. 22-4 at 64:15–21, which was one of the duties listed in the job announcement, ECF No. 18-8 at 2. Moreover, the announcement sought candidates with the "[a]bility to plan and conduct surveys of Critical Infrastructure," ECF No. 18-8 at 3, a skill that would be aided by an applicant's knowledge of local infrastructure and ability to engage with local stakeholders. And nothing about the factor itself—local knowledge and experience—hints at pretext.

     Next, Pitt argues that the panelists gave implausible and conflicting accounts as to why she was not selected. She contends that the panel's failure to give weight to her law enforcement and military experience "despite all the evidence that [they] are valued assets for PSAs" is evidence of pretext. ECF No. 18 at 18. More specifically, she notes that "the job series designated for PSAs is the law enforcement series, a significant portion of the employees serving as PSAs have law enforcement and/or military backgrounds, and the 'primary purpose' of the job is to liaise with entities on 'security compliance/enforcement matters.'" ECF No. 18 at 18 (quoting ECF No. 18-8 at 1). She then cites Nicholas's deposition, where he stated that he gave "zero" weight to her law enforcement experience, ECF No. 18-1 at 114:19–22, and argues that this statement is so "unworthy of credence" that it shows pretext. ECF No. 18 at 18.

None of this shows pretext. Nicholas provided a reasoned explanation for his assessment: in his view, his own law enforcement experience did not "relate to what PSAs do" because PSAs are not involved in enforcement, but only "assist[ing] law enforcement with planning." ECF No. 18-1 at 115:5–21. Indeed, even though he had twenty-five years of law enforcement experience—more than Pitt—he was not selected for multiple PSA positions when he applied, and the feedback he received was that he should first gain PSA-specific experience as a security specialist. *Id.* He further explained that he *would* find law enforcement or military experience relevant in certain circumstances if that experience provided an applicant with local relationships and connections. ECF No. 18-1 at 115:22–116:6.

As Pitt points out, not all the panelists felt the same way, but that also does not show pretext. Clifton, for example, assessed this experience differently. ECF No. 18 at 8. She thought the work Pitt had done with law enforcement "aligned to the PSA program," ECF No. 18-2 at 43:12–18, and stated that Pitt had "experience in both military and law enforcement relating to critical infrastructure protection." ECF No. 17-4 at 9. But it is not surprising that interview panelists might evaluate her experience differently. Indeed, "[o]ne reason for having a panel interview is to get different points of view. . . . If everyone thought about hiring issues and viewed candidates in precisely the same way, little could be gained by having a panel interview." *Hayes v. Sebelius*, 762 F. Supp. 2d 90, 103 (D.D.C. 2011) (finding that interview panelists offering different reasons for not hiring plaintiff did not suggest pretext).[2]

Pitt also contends that, in her view, she performed well at her interview, and that the

---

[2] Pitt does not argue that her experience made her "substantially more qualified," *Holcomb*, 433 F.3d at 897, than the other applicants.

9

panelists gave such conflicting accounts of it that their evaluations are "unworthy of credence." ECF No. 18 at 18. As for her bald, subjective assertion that she "performed well" during her interview, ECF No. 17-19 at 45:6–8; *see also* ECF No. 18 at 9, her "'subjective assessments of [her] own credentials'" are "'largely irrelevant' for purposes of establishing discriminatory motive." *Bell*, 928 F. Supp. 2d at 180 (quoting *Washington v. Chao*, 577 F. Supp. 2d 27, 44 (D.D.C. 2008)). Pitt also conceded in an email to a colleague shortly after the Washington, D.C., interview that she did not perform well: "For some reason I got really nervous, don't know why because I prepared. I got overly excited, and I fumbled. I've done great on these several times in the past, but today, I did poorly, and I blew it." ECF No. 22-6 at 11. Pitt also argues that "Mr. Nicholas testified that Ms. Pitt was confident and interviewed well" and that "Ms. Clifton made vague, and somewhat conflicting, criticisms of Ms. Pitt's interview – saying she appeared to have memorized her answers but also saying she struggled to give any answers at all." ECF No. 18 at 18. As to Nicholas, however, Pitt cites no such deposition testimony in support, *id.*, and as to Clifton, as Defendant points out, it is hardly inconsistent to assert that Pitt seemed to have memorized answers to certain questions but at other times struggled to answer at all. ECF No. 22 at 6. Thus, this evidence does not suggest that Defendant's reasons were pretextual.

Finally, Pitt points out that no African-American woman has ever been a PSA (and only three African-American men are currently PSAs) as evidence of discrimination. ECF No. 18 at 12–13, 22. But as Defendant notes, this evidence does not, without more, show discriminatory animus. ECF No. 22 at 23–24. "In determining whether an employee has been the subject of discrimination, 'the courts have consistently emphasized that the ultimate issue is the reasons for the *individual* plaintiff's treatment, not the relative treatment of different groups within the

10

workplace.'" *Whitener v. England*, 1:04-cv-00273-RWR, 2006 WL 3755220, at *6 (D.D.C. Dec. 19, 2006) (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)). Thus, although statistical evidence may be relevant to a disparate treatment claim, it is "less significant" than it would be to a disparate impact claim, *Horvath v. Thompson*, 329 F. Supp. 2d 1, 10 (D.D.C. 2004), and "merely noting the composition of a workforce, without more, cannot sustain a discrimination action." *Whitener*, 2006 WL 3755220, at *7; *see also Horvath*, 329 F. Supp. 2d at 10 ("[E]vidence that merely indicates an underrepresentation . . . does not itself establish pretext."). And statistical evidence particularly lacks value when, as here, a plaintiff provides no information about the demographics of the pool of qualified applicants. *Whitener*, 2006 WL 3755220, at *7 (granting motion for summary judgment where plaintiff "presented no evidence as to the available pool of applicants . . . *e.g.*, whether sufficient numbers of African Americans apply for such positions that the statistics are significant").[3] For these reasons, this evidence does not raise an issue of material fact as to discrimination.

Ultimately, the Court finds that Pitt has not produced evidence on which a reasonable jury could find that Defendant's proffered nondiscriminatory reason for not selecting Pitt for these positions was pretextual, and that instead she was the victim of discrimination on the basis of race or sex.

### B. PSA Positions in Atlanta

Shortly after Defendant declined to select Pitt for the PSA jobs in Arkansas and Washington, D.C., in part because she failed to show knowledge of the local critical

---

[3] Pitt's assertion that PSAs are recruited from large cities with high populations of African-Americans, ECF No. 18 at 12, 21, is speculative and says nothing about the composition of the pool of qualified applicants.

11

infrastructure, Defendant sought to fill two PSA positions in Atlanta, Georgia—where Pitt has worked for many years—as lateral reassignments available only to employees at the GS-14 or GS-15 level.  ECF No. 18 at 9–10.  As noted earlier, an African-American man and Indian-American man were ultimately selected for the positions.  ECF No. 17-18 at 6.  Pitt alleges that Defendant deliberately set these job qualifications above her pay grade to exclude her from consideration because of her race and sex.  *Id.*

Defendant has put forth another legitimate, nondiscriminatory reason for the way it handled these positions: that they were critical vacancies that for several reasons it needed to fill quickly.  ECF No. 22 at 18–21.  Defendant asserts speed was important because upcoming special events required infrastructure protection activity, including the construction of two new sports arenas; DHS was poised to start a pilot program decentralizing certain duties from headquarters to the field; a longtime PSA announced his retirement just one month prior to the pilot program's launch, while one PSA vacancy was already pending; and a regional disaster response coordination center is in Atlanta, which is particularly critical during hurricane season, *i.e.*, June 1 through November 30.  ECF No. 22-7 at 2–3.  Moreover, Defendant explains that it is "standard practice" to fill PSA positions through lateral reassignment when there is an immediate need, as there was previously, for instance, in Houston, Texas, during security planning for a Super Bowl.  ECF No. 17-17 at 4–5.

Pitt argues that the "generic" and "vague" nature of Defendant's justification for filling the position through reassignment is evidence that this reason is pretextual.  ECF No. 18 at 19–20.  She contends that of the twenty PSA vacancies at the time, only the Atlanta opening was filled through reassignment, and Defendant "has failed to offer any factual basis for singling out

12

the Atlanta position as critical; there are no documents or testimony specifying how long the Atlanta position had been vacant, any special events happening in Atlanta, or what [sic] the ongoing IP activity in Atlanta differed from the many other regions in the country with vacant PSA positions." *Id.* at 19. But Defendant *did* provide specificity on these points. Scott Breor, director of the DHS division that includes PSAs, explained that the immediate need to fill the Atlanta positions arose out of a confluence of factors: the start of the new pilot program, two large, ongoing construction projects, and the departure of a longtime PSA,[4] as well as Atlanta's special status as the location for a regional disaster coordination center. ECF No. 22-7 at 2–3. And there is nothing in the record suggesting that a similar set of conditions was at issue with any other PSA vacancy.

Pitt additionally contends that "[t]he explanation is also called into question based on management's conflicting testimony about who was involved in the decision." ECF No. 18 at 20. According to Pitt, Breor stated that only he and a DHS assistant secretary, Caitlin Durkovich, were involved, while Clifton stated she was also involved. *Id.* But as Breor clarified, he asked Clifton for input about how to fill the PSA positions, and he presented her feedback to Durkovich, who made the final decision. ECF No. 22-7 at 1–2. There is thus no

---

[4] Pitt also argues that Defendant's explanation is implausible because it knew about the PSA's retirement two years before the vacancy announcement. As proof, she cites her own declaration where she states she "felt confident that . . . for years, there had been conversation that the current PSA for Atlanta would be retiring in mid 2015." ECF No. 18-13 at 15. But this evidence says nothing about when those officials responsible for filling the position knew about the retirement, only her own impression. According to Defendant, the PSA did not formally announce his retirement until one month before the pilot program launched and the reassignment opportunities were advertised. ECF No. 22-7 at 3. In any event, Pitt does not dispute that the PSA's departure coincided with the key projects described, which supports Defendant's claim that it needed to fill the positions quickly, no matter when officials knew about the retirement.

genuine conflict in their testimony.  At most, there is some imprecision in their accounts, which does not support an inference of discrimination.  At any rate, Pitt does not dispute that Durkovich made the final decision, *see* ECF No. 18 at 20–21; ECF No. 22 at 17 n.9, and so there is no doubt as to the identity of the decisionmaker.  *Cf. Evans v. Sibelius*, 716 F.3d 617, 621 (D.C. Cir. 2013).  Rather, Pitt merely accuses Defendant of relying on inconsistent testimony and "dissembling."  ECF No. 18 at 21.  But in the end, she does not explain why the division of labor between Breor and Clifton in gathering and presenting the information to Durkovich makes any difference to her claims.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.").

### IV.   Conclusion

For all the above reasons, the Court will grant Defendant's Motion for Summary Judgment, ECF No. 17.  A separate order will issue.

/s/ Timothy J. Kelly<br>
TIMOTHY J. KELLY<br>
United States District Judge

Date: March 5, 2021